PUBLISH

**UNITED STATES COURT OF APPEALS**

**Filed 3/21/96**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

KIM FORD CUCH,

       Defendant - Appellant.

No. 95-4016

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

AUDIE APPAWOO,

       Defendant - Appellant.

No. 95-4034

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
(D.C. Nos. 94-CV-494, 91-CR-240, 92-CV-483, 82-CR-109)**

---

Scott M. Matheson, Jr., United States Attorney (Barbara Bearnson, Assistant United States Attorney, and Matthew R. Howell, Assistant United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellee United States of America.

Manny Garcia, Salt Lake City, Utah, for Defendant-Appellant Cuch.

Wendy Hufnagel, Heber City, Utah, for Defendant-Appellant Appawoo.

---

Before **ANDERSON, KELLY,** and **HENRY,** Circuit Judges.

---

**ANDERSON,** Circuit Judge.

---

The movants in these consolidated cases were both convicted in federal district court of federal crimes committed on land in eastern Utah that we had determined to be part of the Ute Indian Tribe's Uintah Reservation. Ute Indian Tribe v. Utah, 773 F.2d 1087 (10th Cir. 1985) (en banc), cert. denied, 479 U.S. 994 (1986). In 1994, the United States Supreme Court declared that the lands in question were not part of the Uintah Reservation; therefore, the state of Utah, not the federal government, had jurisdiction over crimes committed in the disputed area. Hagen v. Utah, 114 S. Ct. 958 (1994).

Relying on Hagen, the movants now collaterally attack their convictions pursuant to 28 U.S.C. § 2255, claiming them to be void for want of jurisdiction. The issue is whether the Hagen decision both can and should be applied prospectively only with respect to convictions on collateral review. The district court in each case answered these questions in the affirmative. We agree. The Supreme Court, and by extension this court, has the undoubted power to declare that its jurisdictional and other decisions shall be limited to prospective application; and neither controlling precedent, policy considerations, nor questions of fundamental fairness require a different result here. Accordingly, we affirm.

**BACKGROUND**

In 1975, the Ute Indian Tribe sought to exercise jurisdiction over all land originally encompassed in its Uintah Reservation, including land in and around the cities of Roosevelt and Tridell, Utah. When non-Indians protested the action, the tribe sued in federal court for declaratory and injunctive relief, and the state of Utah intervened. Ute Indian Tribe v. Utah, 75-C-408 (D. Utah).[1] The course of the litigation is as follows:

In 1976, the United States District Court for the District of Utah issued a preliminary injunction in favor of the tribe, enjoining the state from exercising jurisdiction in the disputed lands pending a decision on the merits.[2] The court held a trial on the merits in 1979 and issued an opinion in 1981 in favor of the tribe, holding that Congress's decision to open the Reservation to non-Indian settlement in 1905 had no effect on the Reservation boundaries. Ute Indian Tribe v. Utah, 521 F. Supp. 1072 (D. Utah 1981). After a panel of this court addressed the question on appeal, Ute Indian Tribe v. Utah, 716 F.2d 1298 (10th Cir. 1983), we affirmed in pertinent part in an en banc

---

[1]The details of the tribe's claims are extensively covered in the various opinions addressing the matter and need not be repeated here. See Ute Indian Tribe v. Utah, 521 F. Supp. 1072 (D. Utah 1981), aff'd in pertinent part, 773 F.2d 1087, 1089 (10th Cir. 1985) (en banc), modifying 716 F.2d 1298 (10th Cir. 1983), cert. denied, 479 U.S. 994 (1986).

[2]The court issued the injunction after a state court decision affirmed state jurisdiction over the disputed lands. Brough v. Appawora, 553 P.2d 934 (Utah 1976), vacated and remanded, 431 U.S. 901 (1977). The Eleventh Amendment did not bar the injunction, as the state waived its immunity by intervening in the litigation. See Ute Indian Tribe, 521 F. Supp. at 1075 n.1 (citing Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 276-82 (1959)).

rehearing. Ute Indian Tribe v. Utah, 773 F.2d 1087, 1089 (10th Cir. 1985). The Supreme Court subsequently denied certiorari. Utah v. Ute Indian Tribe, 479 U.S. 994 (1986).

From 1976 forward, relying on the various decisions in the Ute litigation, federal prosecutors brought charges against Indians for criminal acts committed within the historical boundaries of the Reservation. See DeCoteau v. District County Ct. for the Tenth Judicial Dist., 420 U.S. 425, 427 & nn.1-2 (1975) (discussing federal criminal jurisdiction over Indian acts on reservations). Challenges to federal jurisdiction during that time were dismissed or decided on the authority of Ute Indian Tribe. See, e.g., United States v. McCook, 92-CR-286W (D. Utah), cited in Appellee's Br. at 10 n.6; cf. United States v. Felter, 546 F. Supp. 1002, 1003 & n.1 (D. Utah 1982) (identifying land on which Indian defendant allegedly illegally fished as Indian country), aff'd, 752 F.2d 1505 (10th Cir. 1985); State v. Gardner, 827 P.2d 980, 980 n.1 (Utah Ct. App.) (assuming city of Roosevelt lay within Reservation boundaries for purposes of state jurisdictional challenge), cert. denied, 836 P.2d 1383 (Utah 1992).

In the late 1980s and early 1990s, the state of Utah renewed its assertion of jurisdiction over the lands in question, and the state's highest court concurred. See State v. Perank, 858 P.2d 927 (Utah 1992); State v. Coando, 858 P.2d 926 (Utah 1992); State v.

Hagen, 858 P.2d 925 (Utah 1992), aff'd, 114 S. Ct. 958 (1994).[3]  Because these state

cases inherently conflicted with our Ute Indian Tribe decision, which continued to control

federal prosecutorial decisions in the Uintah Basin, the state agreed it would not enforce

its new decisions until the matter could be finally resolved by the United States Supreme

Court.  See Appellee's Br. at 11-12 n.9 (quoting stipulation); see also State v. Hagen, 858

P.2d at 925 (staying state court cases at state's request pending federal proceedings).  The

federal district court in Utah subsequently issued an injunction incorporating the terms of

the state's stipulation.  See Ute Indian Tribe, 75-C-408 (D. Utah), Order dated Sept. 2,

1992, at 1-2, quoted in Appellee's Br. at 12 n.9.

In 1994, the Supreme Court handed down its opinion in Hagen v. Utah, 114 S. Ct.

958 (1994).  Hagen involved a state criminal judgment obtained for acts committed

within the Reservation boundaries established by Ute Indian Tribe.  Interpreting

Congress's intent in opening the Reservation to non-Indian settlement, and noting among

other factors our decision in Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d

1387, 1400 (10th Cir.) (criticizing Ute Indian Tribe's conclusion as "unexamined and

unsupported in the opinion," though leaving its viability intact), cert. denied, 498 U.S.

1012 (1990), the Supreme Court held that the state had jurisdiction to prosecute Hagen

because Congress had diminished the Uintah Reservation in the early 1900s.  See Hagen,

---

[3]The defendants in these state cases did not assert that the state of Utah, which had intervened in the Ute Indian Tribe litigation, was collaterally estopped from relitigating the Reservation boundaries.  See Hagen v. Utah, 114 S. Ct. at 964-65.

114 S. Ct. at 967, 970. The <u>Hagen</u> decision effectively overruled the contrary conclusion reached in the <u>Ute Indian Tribe</u> case, redefined the Reservation boundaries resulting from our earlier decision, and conclusively settled the question.

The movants in the instant cases are Indians sentenced to federal prison for crimes committed in violation of federal law during the time the <u>Ute Indian Tribe</u> decisions were in effect. In 1982, movant Audie Appawoo pled guilty to second degree murder under 18 U.S.C. §§ 1111 and 1153 for a homicide he committed near Tridell, Utah.[4] In 1992, movant Kim Ford Cuch pled guilty to sexual abuse under 18 U.S.C. §§ 2242(2)(B) and 1153 and abusive sexual contact under 18 U.S.C. §§ 2244(a)(1) and 1153 for sexual misconduct he committed in Roosevelt, Utah.[5] The conduct underlying each of these offenses must be prosecuted in federal court if it takes place in "Indian country," <u>see</u> 18 U.S.C. § 1153(a), defined by Congress to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government," <u>id.</u> § 1151. <u>See</u> <u>Negonsott v. Samuels,</u> 113 S. Ct. 1119, 1121-22 (1993). As indicated above, at the time Appawoo and Cuch each pled guilty, the law in this circuit recognized the areas in which

_____

[4]At oral argument, counsel for the government represented, and counsel for Appawoo did not dispute, that the charge to which Appawoo pled guilty identified the crime scene as "near Tridell" and characterized the location as "within Indian country." <u>See also</u> Appawoo Br. app. D (deed identifying property where homicide occurred).

[5]Cuch pled guilty to the charges in an indictment and a felony information, each of which characterized the location of the crimes as "within Indian country." Furthermore, Cuch's Statement in Advance of Plea of Guilty, which the district court read on the record in open court, admitted that the sexual offenses occurred in Roosevelt city. <u>See</u> Cuch R. Vol. I, Tab 9, at 24-25 n.26.

each movant committed his criminal acts as part of the Uintah Reservation, mandating exclusive federal jurisdiction.

Following the <u>Hagen</u> decision, Cuch moved to vacate his sentence pursuant to 28 U.S.C. § 2255. He argued that the federal court had no jurisdiction over him because the sexual abuse crimes to which he pled guilty did not take place in Indian country as defined by <u>Hagen</u>. The case was referred to a magistrate judge, who recommended granting the motion and immediately releasing Cuch. The district court denied the motion, however, declining to apply <u>Hagen</u> retroactively on collateral review. <u>See</u> <u>Cuch v. United States</u>, 875 F. Supp. 767 (D. Utah 1995).

Appawoo likewise moved to vacate his murder sentence under § 2255, raising the same issue. The district court in that case relied on the decision in <u>Cuch</u> to deny the motion in an unpublished order. <u>See</u> Appawoo R. Vol. I, Tab 24. Both Cuch and Appawoo now appeal, incorporating the report and recommendation of the magistrate judge in <u>Cuch</u> as the primary basis for their arguments. <u>See</u> Cuch Br. at 4-5 & app. D; Appawoo Br. at 7.

## DISCUSSION

We note at the outset that we may properly examine a district court's subject matter jurisdiction on collateral review. <u>See</u> 28 U.S.C. § 2255; <u>United States v. Cook</u>, 997 F.2d 1312, 1320 (10th Cir. 1993) ("[J]urisdictional issues are never waived and can

- 7 -

be raised on collateral attack . . . ."). We review jurisdictional issues de novo. E.g., Kelley v. Michaels, 59 F.3d 1055, 1057 (10th Cir. 1995). These motions present additional, related legal issues that are likewise subject to our plenary review. See United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990). We address each of these issues in turn.

1.

The Supreme Court can and does limit the retroactive application of subject matter jurisdiction rulings.[6] For example, in O'Callahan v. Parker, 395 U.S. 258 (1969), overruled by Solorio v. United States, 483 U.S. 435 (1987), the court held that constitutional restraints deprived military courts of jurisdiction to try individuals for nonservice connected crimes. Nevertheless, in Gosa v. Mayden, 413 U.S. 665 (1973), the Court refused to apply its ruling retroactively to invalidate convictions on collateral review.

Likewise, in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), the Court held that the Bankruptcy Act of 1978 had unconstitutionally

---

[6]See generally Linkletter v. Walker, 381 U.S. 618, 629 (1965) ("[W]e are neither required to apply, nor prohibited from applying, a decision retrospectively . . . ."); Great No. Ry. v. Sunburst Oil & Ref. Co., 287 U.S. 358, 364 (1932) (Cardozo, J.) (U.S. Constitution has "no voice upon the subject" of retroactivity; courts are free to apply judicial decisions prospectively, in their discretion, "whenever injury or hardship will thereby be averted").

vested Article I bankruptcy courts with power to determine certain questions reserved to Article III courts. Faced with the inevitable consequences of its decision, the Supreme Court determined to apply its decision prospectively only. Id. at 87-88, 92; cf. Buckley v. Valeo, 424 U.S. 1, 140-43 (1976) (per curiam) (prospectively invalidating adjudicatory power of Federal Election Commission); Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374-77 (1940) (prospectively invalidating bankruptcy jurisdiction); supra note 6.[7]

The law on the point is settled in our circuit. Before the Supreme Court decided Gosa, we reached a similar conclusion regarding the prospectivity of O'Callahan, as did several other courts. See Schlomann v. Moseley, 457 F.2d 1223, 1227-30 (10th Cir. 1972), cert. denied, 413 U.S. 919 (1973). In Schlomann, we recognized the clear "jurisdictional basis" of O'Callahan, but nevertheless concluded that prospective application was more appropriate under the circumstances. Id. at 1226, 1227-30.

---

[7]Concededly, the point is not without dispute. In Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 379 (1981), Justice Marshall wrote for the Court that "[a] court lacks discretion to consider the merits of a case over which it is without jurisdiction, and thus, by definition, a jurisdictional ruling may never be made prospective only." The prospective jurisdictional ruling in Marathon, in which Justice Marshall joined, makes no mention of the Risjord decision. However, commentators have noted the discrepancy between what the Supreme Court said in Risjord and what it did in Marathon. See, e.g., John Bernard Corr, Retroactivity: A Study in Supreme Court Doctrine "As Applied", 61 N.C. L. Rev. 745, 790-92 (1983) (discussing "Retroactivity for Jurisdictional Matters"); see also Budinich v. Becton Dickinson & Co., 486 U.S. 196, 203 (1988) (quoting Risjord without mentioning Marathon).

The argument that a jurisdictional ruling such as <u>Hagen</u> should not be applied retroactively to cases on collateral review is based on principles of finality and fundamental fairness. As the Court emphasized in <u>Teague v. Lane</u>, 489 U.S. 288, 309 (1989), "the principle of finality . . . is essential to the operation of our criminal justice system." Consequently,

> "[t]he interest in leaving concluded litigation in a state of repose . . . may quite legitimately be found by those responsible for defining the scope of the writ to outweigh in some, many, or most instances the competing interest in readjudicating convictions according to all legal standards in effect when a habeas petition is filed."

<u>Id.</u> at 306 (quoting <u>Mackey v. United States</u>, 401 U.S. 667, 683 (1971) (Harlan, J., concurring in judgments in part, dissenting in part)).[8] <u>Hagen</u> was decided after these movants' convictions became final.[9] Its result "was not dictated by precedent existing at [that] time." <u>Id.</u> at 301 (emphasis omitted). Thus, its holding should not provide the basis for a collateral attack in these cases. <u>See</u> <u>Gilmore v. Taylor</u>, 113 S. Ct. 2112, 2116

_____

[8]This overriding interest in finality is a primary factor distinguishing collateral review from direct review for due process purposes. <u>See</u> <u>Teague</u>, 489 U.S. at 304-10; <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321-24 (1987); <u>Yates v. Aiken</u>, 484 U.S. 211, 215 (1988) (noting "the important distinction between direct review and collateral review"); <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555-59 (1987) (due process does not require appointment of counsel on collateral review, though it does on direct review); <u>Shea v. Louisiana</u>, 470 U.S. 51, 58 & n.4 (1985) (distinguishing collateral review from direct review for retroactivity purposes). <u>But cf.</u> Movants' Briefs at 13 (arguing on collateral review that prosecution of these movants in federal court violated due process).

[9]"By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." <u>Griffith</u>, 479 U.S. at 321 n.6.

(1993); <u>Gosa</u>, 413 U.S. at 678-79 (applying retroactivity test for new criminal procedure rules on collateral review); <u>Schlomann</u>, 457 F.2d at 1228 (same); <u>see also infra</u> part 3.a (distinguishing cases narrowing the scope of federal crimes).

A subset of the principle of finality is the prospect that the invalidation of a final conviction could well mean that the guilty will go unpunished due to the impracticability of charging and retrying the defendant after a long interval of time. "Wholesale invalidation of convictions rendered years ago could well mean that convicted persons would be freed without retrial, for witnesses . . . no longer may be readily available, memories may have faded, records may be incomplete or missing, and physical evidence may have disappeared." <u>Gosa</u>, 413 U.S. at 685. Furthermore, retroactive application "would surely visit substantial injustice and hardship upon those litigants who relied upon . . . jurisdiction in the [federal] courts," <u>Marathon</u>, 458 U.S. at 88, particularly victims and witnesses who have relied on the judgments and the finality flowing therefrom. Retroactivity would also be unfair to law enforcement officials and prosecutors, not to mention the members of the public they represent, who relied in good faith on binding federal pronouncements to govern their prosecutorial decisions. "Society must not be made to tolerate a result of that kind when there is no significant question concerning the accuracy of the process by which judgment was rendered . . . ." <u>Gosa</u>, 413 U.S. at 685.

2.

These and similar reasons weigh in favor of nonretroactivity in these cases. There is no question of guilt or innocence here. Appawoo pled guilty to murder. Cuch pled guilty to sexual assault and related crimes. Each of the cases involved conduct made criminal by both state and federal law.[10]

Consequently, the question before the court focuses on where these Indian defendants should have been tried for committing major crimes. As in O'Callahan, "[t]he question was not whether [the petitioners] could have been prosecuted; it was, instead, one related to the forum, that is, whether, as we have said, the exercise of jurisdiction by a . . . tribunal, pursuant to an act of Congress, . . . was appropriate . . . ." Gosa, 413 U.S. at 677 (emphasis added); see also Schlomann, 457 F.2d at 1227 n.5. Nor do the movants assert any unfairness in the procedures by which they were charged, convicted, and sentenced upon their guilty pleas. Nothing in Hagen brings into question the truth finding functions of the federal courts that prosecuted Indians for acts committed within the historic boundaries of the Uintah Reservation. As was true of the courts-martial predating O'Callahan, the federal criminal judgments at issue here produced an accurate

---

[10]The crimes of which the movants were convicted fall within a congressionally defined list that includes "murder, manslaughter, kidnapping, maiming, [sexual abuse], incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury . . ., an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and [theft]." 18 U.S.C. § 1153(a); see also Utah Code Ann. §§ 76-5-201 to -209 (defining state criminal homicide); id. §§ 76-5-401 to -411 (defining state sexual offenses). Federal law requires that such conduct be punished by reference to state law if no federal statute defining the crime exists at the time. See 18 U.S.C. § 1153(b).

picture of the conduct underlying the movants' criminal charges and provided adequate procedural safeguards for the accused.  See Gosa, 413 U.S. at 680-81.[11]

We emphasize that these are cases on collateral review.  The convictions are final. Direct appeal times have passed.  Furthermore, the federal courts were the only tribunals available, both pursuant to our decisions and by intergovernmental pact.  The state of Utah was barred from prosecuting such crimes from 1976 to 1994 by state stipulations and orders, federal injunctions, and conclusive federal litigation to which it was a party. Case law binding the state, affirmed by this court sitting en banc, with certiorari denied by the Supreme Court, required exclusive federal jurisdiction.  During that time, there was no legal or practical alternative for prosecuting the movants, thereby distinguishing any Indian jurisdiction case cited to us in the briefs[12] and making the case for prospectivity even stronger here than in Gosa.[13]

---

[11]In fact, as the government points out, the movants had available to them the benefits of indictment by grand jury and trial by jury -- the very rights missing in courts-martial and therefore driving O'Callahan's decision to limit military jurisdiction -- thus presenting an even stronger case for prospectivity than in Gosa.

[12]See Duro v. Reina, 495 U.S. 676, 696-98 (1990) (identifying possible jurisdictional alternatives to tribal court for nonmember Indian crimes); Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979); United States v. John, 437 U.S. 634 (1978); Oliphant v. Suquamish Indian Tribe, 435 U.S. 191 (1978); Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351 (1962).

[13]See Gosa, 413 U.S. at 669 (civilian court available to try Gosa).  As counsel for the government aptly put it at oral argument, requiring that Indian prosecutions proceed in federal court, only to later hold that such prosecutions should have proceeded in state

(continued...)

The chances now of a successful prosecution in a state forum after this long passage of time are slim. The evidence is stale and the witnesses are probably unavailable or their memories have dimmed. Adopting the movants' retroactivity argument would effectively create, in the words of the district court, an "ex post facto lawless zone" for major crimes committed by Indians in the Uintah Basin between 1976 and 1994. See Cuch, 875 F. Supp. at 769. Finally, the violent and abusive nature of the underlying criminal conduct involved here is no small factor, along with the burdens that immediate release of these prisoners would place directly on victims (regardless of whether the offenders are reprosecuted), many of whom are child victims of sexual abuse. See Appellee's Br. at 42.

3.

a.

The movants cite two lines of cases for the proposition that Hagen must be applied retroactively to invalidate their convictions. The first line of cases stems from United States v. Johnson, 457 U.S. 537 (1982), in which the Court noted that in certain "narrow categories of cases, the answer to the retroactivity question has been effectively

---

[13](...continued)
court, would create the "ultimate legal catch-22."

determined . . . through application of a threshold test" rather than by balancing competing concerns.  Id. at 548.

The movants rely for their argument on one of these categories, comprising cases in which the Supreme Court "has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place."  Id. at 550 (citing United States v. United States Coin & Currency, 401 U.S. 715, 724 (1971); Robinson v. Neil, 409 U.S. 505, 509 (1973); Ashe v. Swenson, 397 U.S. 436, 437 n.1 (1970); Moore v. Illinois, 408 U.S. 786, 800 (1972)).  However, in each of these cases, the Constitution either immunized the underlying conduct from punishment in any court or prevented a trial from taking place at all.  Id. at 550; Gosa, 413 U.S. at 677, 678-79; Schlomann v. Moseley, 457 F.2d 1223, 1227 n.5 (10th Cir. 1972), cert. denied, 413 U.S. 919 (1973); see United States Coin & Currency, 401 U.S. at 723-24 (invalidating forfeiture proceedings following conviction obtained in violation of privilege against self-incrimination); Robinson, 409 U.S. at 509 (preventing prosecution on double jeopardy grounds); Ashe, 397 U.S. at 437 n.1 (1970) (same); Moore, 408 U.S. at 800 (preventing capital punishment on Eighth Amendment grounds).

In the instant cases, "[o]ur concern, instead, is with the appropriateness of the exercise of jurisdiction by a . . . forum" over cases involving "offense[s] . . . for which the defendant was not so immune."  Gosa, 413 U.S. at 677, 679.  Gosa, which closely parallels the instant cases, found the line of cases cited in Johnson distinguishable, and so

- 15 -

do we.  See id.; see also Schlomann, 457 F.2d at 1227 n.5; cf. Johnson, 457 U.S. at 549-50 (excluding Gosa from this category of cases); Corr, supra note 6, at 790-92 (contrasting Gosa with United States Coin & Currency and Robinson).  Those cases are simply not controlling and therefore do not require retroactivity.[14]

The movants also cite to a second line of cases in which substantive nonconstitutional decisions concerning the reach of a federal statute were afforded complete retroactivity.  Davis v. United States, 417 U.S. 333 (1974); United States v. Shelton, 848 F.2d 1485 (10th Cir. 1988) (en banc); United States v. Sood, 969 F.2d 774 (9th Cir. 1992); see also United States v. Dashney, 52 F.3d 298 (10th Cir. 1995).  In each of these cases, the courts determined that a new Supreme Court interpretation of a criminal statute, which narrowed the scope of the relevant crime, should be applied retroactively on collateral review.  The courts relied on the new decisions to vacate the convictions, holding that the petitioners had been convicted for conduct Congress had never made criminal.

These cases are distinguishable on their face.  Hagen did not purport to narrow the scope of the federal criminal statutes under which the movants pled guilty so as to

_____

[14]The Johnson Court also cited to the dissenting opinions in Gosa, 413 U.S. at 693, and Michigan v. Payne, 412 U.S. 47, 61 (1973), where Justice Marshall argued, based on the cases we have just distinguished, that retroactivity is mandated when a later decision determines a trial court lacked jurisdiction in the traditional sense.  Johnson, 457 U.S. at 550-51.  But see Gosa, 413 U.S. at 685-86 (applying O'Callahan prospectively only); id. at 678 (noting that Payne afforded North Carolina v. Pearce, 395 U.S. 711 (1969), prospective application using conventional retroactivity analysis).

exclude the conduct -- homicide and abusive sexual acts -- underlying their criminal judgments. To the contrary, Congress clearly intended that such conduct be made criminal and be punished in federal court whenever state court jurisdiction was lacking. See 18 U.S.C. §§ 1152-1153; see also supra part 2 (discussing lack of state jurisdiction over Indians in Uintah Basin between 1976 and 1994). But cf. Sood, 969 F.2d at 775 (Congress did not intend 18 U.S.C. § 666 to apply in Territory of Guam). Davis, Shelton, and Sood have no application in the instant cases.

Finally, we find no "exceptional circumstances" or other conditions resulting in a "complete miscarriage of justice" to these movants that would mandate or counsel retroactive application of Hagen to invalidate these convictions. See Davis, 417 U.S. at 346; Shelton, 848 F.2d at 1489. As set out above, we find no indication that an innocent person may have been convicted for crimes he did not commit. See Murray v. Carrier, 477 U.S. 478, 496 (1986). Rather, we find that substantial justice took place in the only judicial forum available for prosecution at the time the crimes were committed. We are satisfied that the primary goal of habeas review -- "'insuring the reliability of the guilt-determining process'" -- has been met in these cases. See Paul J. Mishkin, The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 80 (1965) (quoting Kadish, Methodology and Criteria in Due Process Adjudication -- A Survey and Criticism, 66 Yale L.J. 319, 346 (1957)).

In sum, we find the circumstances surrounding these cases make prospective application of <u>Hagen</u> unquestionably appropriate in the present context.[15]

b.

The movants also rely on the point made by the learned magistrate judge that <u>Hagen</u> did not effect a "change" in federal law, but merely clarified what had been the law all along. <u>See</u> Report & Recommendation, Cuch R. Vol. I, Tab 10, at 14-15. Under this approach, <u>Ute Indian Tribe</u> "made an erroneous interpretation of federal law and the Utah courts made the correct interpretation." <u>Id.</u> at 15. "Congress had already defined the limits of federal jurisdiction. . . . It was the inability to see the jurisdictional line drawn by Congress that created the problem." <u>Id.</u> at 21. Retroactivity under such reasoning was axiomatic.

The magistrate judge's analysis partakes of the Blackstonian common law view that courts do no more than discover the law. <u>Linkletter v. Walker</u>, 381 U.S. 618, 622-23 (1965). "The Blackstonian view ruled English jurisprudence and cast its shadow over our own" through much of our jurisprudential history. <u>Id.</u> at 624. But American law, drawing, as it does, from experience, gradually recognized that "such a rule was out of tune with actuality." <u>Id.</u>; <u>see also id.</u> at 629. In time, the Supreme Court admitted that

---

[15]Our decision is bolstered by our confidence that <u>Gosa</u> -- the Supreme Court case most closely aligned with our issue -- would reach the same conclusion today as it did 23 years ago, despite significant intervening changes in retroactivity law.

"[t]he past cannot always be erased by a new judicial declaration." Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374 (1940). "Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination." Id. In short, while a judicial decision is in effect, "it is . . . an existing juridical fact." Linkletter, 381 U.S. at 624 (discussing Austinian view).

This latter view is now firmly established in the federal courts. "[T]he accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." Id. at 628.[16] While the jurisdictional nature of a holding makes the retroactivity question "more critical," the nature of the case alone "does not dispense with the duty to decide whether 'the Court may in the interest of justice make the rule prospective . . . where the exigencies of the situation require such application.'" Schlomann, 457 F.2d at 1227 (quoting Johnson v. New Jersey, 384 U.S. 719, 726-27 (1966) (quoting Linkletter, 381 U.S. at 628)).

---

[16]While later cases have overruled the specific retroactivity test announced in Linkletter, see, e.g., Griffith v. Kentucky, 479 U.S. 314 (1987), the cases have continued to recognize the validity of Linkletter's underlying premise that retroactivity generally is not compelled in our courts, see, e.g., id.; Teague v. Lane, 489 U.S. 288 (1989). The Linkletter Court opined that "'there is much to be said in favor of such a rule for cases arising in the future.'" Linkletter, 381 U.S. at 628 (quoting Mosser v. Darrow, 341 U.S. 267, 276 (1951) (Black, J., dissenting)). For the reasons already expressed in this opinion, we think the instant cases present a vivid illustration of this point.

While prospectivity may be the exception rather than the rule, these cases present the type of extraordinary circumstances that justifies applying the exception.[17] Thus, we respectfully disagree with the magistrate judge that our judicial hands are tied on the retroactivity question when justice requires a different result. Rather, we agree with the district court that our conclusion illustrates how "[t]he rule of law is strengthened when courts, in their search for fairness, giving proper consideration to the facts and applicable precedent, allow the law to be an instrument in obtaining a result that promotes order, justice and equity." Cuch, 875 F. Supp. at 772.

**CONCLUSION**

As indicated above, the central underlying question is whether the Supreme Court has the power to limit the retroactive effect of its rulings in cases similar to the ones before us. We conclude that the Court -- and, by extension, our court -- does have that power. Applying that principle, we further conclude that we can and should apply Hagen v. Utah prospectively only with respect to federal criminal convictions on collateral review. Principles of finality and fairness dictate such a result, and no controlling

---

[17]At the same time, we recognize the continuing validity of Shelton and similar cases, which are not affected by this decision. See supra part 3.

authority mandates retroactivity.  Accordingly, we AFFIRM the decisions of the district

court denying these § 2255 motions.[18]

_____

[18]Because of our disposition of these appeals, we need not address the government's argument that the movants are barred from attacking their criminal judgments on collateral review under United States v. Broce, 488 U.S. 563 (1989), because they entered counseled, voluntary guilty pleas admitting to each essential element of the crimes charged.  See Cuch R. Vol. I, Tab 9, at 24-30; id. Tab 13, at 19-20; cf. Cuch, 875 F. Supp. at 772 n.10.  Accordingly, we need not examine the government's related contention that by stipulating to the location and character of the respective crime scenes, the movants stipulated to facts from which jurisdiction may be inferred.  See supra notes 4-5.